## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SANDRA L. BORYS,** | : | **No. 3:23-CV-1041** |
| | : | |
| **Plaintiff** | : | **(Caraballo, M.J.)** |
| | : | |
| **v.** | : | |
| | : | |
| **FRANK BISIGNANO,**[1] | : | |
| **Commissioner of Social** | : | |
| **Security Administration,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Pending before the Court is the appeal by Plaintiff Sandra Borys of the decision by the Commissioner of Social Security Administration ("the Commissioner") to deny her application for disability benefits. For the reasons set below, the Commissioner's decision is affirmed.

## I.    Introduction

Borys seeks judicial review of the Commissioner's final decision to deny her application for disability benefits under Title II of the Social

---

[1] Frank Bisignano became the Commissioner on May 7, 2025. Pursuant to Federal Rule of Civil Procedure 25(d) and Title 42, United States Code, Section 405(g), Bisignano is substituted for Kilolo Kijakazi, a former Commissioner, as the Defendant in this suit.

Security Act.  The Court has jurisdiction pursuant to Title 42, United States Code, Section 405(g).

Borys challenges the three alleged errors that Administrative Law Judge ("ALJ") Gerard W. Langan committed when determining that she was not disabled under the Social Security Act.  Namely, Borys claims that the ALJ: (1) made inadequate function-by-function assessments in defining residual functional capacity; (2) lacked substantial evidence in rejecting three treating physician opinions on her limitations to time-off tasks, absences, and unscheduled breaks in formulating her residual functional capacity; and (3) in step five of the sequential analysis, failed to identify and resolve a conflict between vocational expert testimony and the *Dictionary of Occupational Titles* ("*DOT*") with regard to her overhead reaching limitation.  Doc. 8 at 8.  The matter is fully briefed and ripe for decision.

As explained below, ALJ Langan's conclusion on each of the challenged issues was supported by substantial evidence in the record, coupled with sufficient reasoning to permit meaningful judicial review. Accordingly, the Court affirms the Commissioner's decision to deny Borys's claim for social security disability benefits.

## II.  **Background**

On April 22, 2020, Borys applied for social security disability benefits, alleging complete disability from high cholesterol, depression, anxiety, Barrett's esophagus, cervical fusion, limited upper extremity movement, insomnia, restless leg syndrome, gastroesophageal reflux disease, and Raynaud's disease. Tr.[2] 83–84. The Social Security Administration ("SSA") denied Borys's application on August 17, 2020. *Id.* at 125–28. Borys requested reconsideration, *id.* at 129, but her application was denied again on December 23, 2020. *Id.* at 132–34. Borys accordingly requested a hearing on February 26, 2021. *Id.* at 135–36. The SSA granted the request and held an administrative hearing. *Id.* at 20.

The hearing, held on October 15, 2021, *id.*, concerned whether Borys was disabled within the meaning of the Social Security Act from June 13, 2019, through December 31, 2024—the last date Borys was eligible to receive social security disability insurance. *Id.* at 22. ALJ Langan evaluated clinical records, medical history, medical expert

---

[2] The administrative record, referred to herein as "Tr.," encompasses Docs. 7, 7-1, 7-2, 7-3, 7-4, 7-5, 7-6, 7-7, 7-8.

reports, vocational expert testimony, and Borys's own testimony. *Id.* at 47–82.

Toward the end of the hearing, ALJ Langan asked Carmine Abraham, a vocational expert, to assess whether alternative employment options in the national economy exist for Borys. *Id.* at 71–79. Abraham first confirmed that Borys's previous job ("a certified nurse assistant") was a "medium, semi-skilled" occupation. *Id.* at 73. Then the ALJ asked the vocational expert to assume

> an individual of the same age, education, past work experience as that of [the] claimant[] . . . . [The] hypothetical individual [is] capable of performing light exertional work. However, [the] hypothetical individual should avoid unprotected heights[,] . . . [and] avoid climbing ladders and scaffolds but may occasionally climb ramps and stairs. [The] hypothetical individual would be capable of occasional exposure to temperature extremes, wetness, and vibration.

*Id.* at 73–74. When ALJ Langan then asked whether the hypothetical person could perform Borys's past job, Abraham answered that such limitations precluded the occupation. *Id.* at 74.

Then, the ALJ asked the vocational expert to "provide representative samples of occupations which exist in the national economy that an individual with those same limitations and restrictions would be capable of performing[.]" *Id.* Abraham, clarifying that such a

4

person needs "light work," testified that the person may work as a garment folder, rental clerk, or a marker. *Id.*

The response prompted ALJ Langan to change the hypothetical by adding that:

> [The] hypothetical individual should avoid interaction with the public[,] except for incidental contact such as providing directions to a restroom or a department in a larger facility. In addition, [the] hypothetical individual would be capable of occasional interaction with coworkers and supervisors. . . . [The] hypothetical individual also should avoid occupations which would require a fast production rate pace[,] such as that found with respect to quotas, piecework, or timed work.

*Id.* at 74–75. The vocational expert opined that "rental clerk position would be eliminated due to frequent interaction with the public," and stated that such a person would be able to work as a routing clerk. *Id.* at 75.

Abraham's answer prompted the ALJ to impose additional conditions, namely that the hypothetical person

> should be afforded the ability to alternate between sitting and standing every 30 minutes. In addition, [the] hypothetical individual should avoid use of the right upper extremity for overhead activity. [The] hypothetical individual may make occasional use of the left upper extremity for overhead activity. Finally, [the] hypothetical individual should avoid occupations which would expose her to noise above a level 3 noise intensity level.

*Id.* at 75–76.  Those additional limitations led the vocational expert to state that the available numbers of garment folder, marker, and routing clerk positions would decrease by about 50 percent.  *Id.* at 76.  Then the ALJ asked whether Abraham's opinions were "consistent with the *Dictionary of Occupational Titles* and its related publications."  *Id.*  The vocational expert responded by stating that "[t]he differences would one be in regard to the claimant's past work . . . based upon the physical requirements as the claimant described . . . and in the file information," and "in regard to alternating of positions, the reduction of the numbers, as well as overhead activities."  *Id.* at 76–77.

Based on the evidence, the ALJ denied Borys's disability claim on November 30, 2021, finding that she was not disabled during the period at issue.  *Id.* at 17–35.  ALJ Langan reached that conclusion by employing a five-step analytical process required under the Social Security Act to evaluate disability insurance and supplement security income claims.  *See* 20 C.F.R. § 404.1520(a)(4).

The process requires sequential consideration of: (1) whether the claimant is engaged in substantial gainful work activity; (2) the medical severity of the claimant's impairments; (3) whether the impairment

meets or equals a defined list of impairments; (4) a comparison between the claimant's past relevant work and residual functional capacity, i.e., the most work that a claimant can perform despite his or her limitations, *see id.* § 404.1545(a); and (5) an assessment of the claimant's residual functional capacity and his or her age, education, and work experience. *Id.* § 404.1520(a)(4)(i)–(v).  Should a claimant proceed past the first three steps, the Commissioner will not find the claimant disabled when he or she can perform past relevant work under the third step or adjust to other work under the fourth step. *Id.* § 404.1520(a)(4)(iv)–(v), (f), (g).

Applying that analysis, the ALJ first determined that Borys last met the insurance requirements of the Social Security Act, *see id.* § 404.130, on October 15, 2021.  Tr. 22.  ALJ Langan also found that Borys did not engage in substantial gainful activity between her alleged disability onset date of June 13, 2019, through December 31, 2024. *Id.* at 22–23.

At the second step of the analysis, the ALJ found that Borys suffered from seven severe impairments: degenerative disc disease in the cervical spine, status-post anterior cervical discectomy and fusion at

7

C4 and C6, restless leg syndrome, Raynaud's disease, depression, and anxiety. *Id.* at 23. ALJ Langan also acknowledged that Borys suffered from bursitis, infraspinatus, supraspinatus, and calcific tendinitis; tendinopathy; chronic kidney disease; lumbar degenerative disc disease; hypercholesterolemia; gastroesophageal reflux disease; insomnia; and Barrett's esophagus. *Id.* But because "there is no medical evidence of record to indicate that these conditions have more than minimally affected her ability to perform work related activities, when properly treated," he deemed them "non-severe impairments." *Id.*

Moving to the third step of the analysis, the ALJ determined that Borys's impairments failed to meet or medically equal one of the impairments listed in the SSA's regulations. *Id.*

Regarding Borys's cervical conditions and restless leg syndrome, ALJ Langan found that "they do not satisfy the requisite laboratory, clinical, and/or diagnostic requirements for listing level severity." *Id.* As for the claimant's Raynaud's disease, the ALJ noted that she "does not suffer from gangrene or ischemia with digital ulcerations that preclude the claimant from ambulating effectively or from effectively performing fine or gross dexterous movement in the hands.

8

Accordingly, the undersigned concludes that the claimant's condition does not satisfy the criteria of listing level severity." *Id.* Finally, as to Borys's anxiety and depression, ALJ Langan determined that neither impairment was severe enough. *Id.* at 25–27. In sum, Borys did not automatically qualify as disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

Accordingly, the ALJ proceeded to determine Borys's residual functional capacity before addressing the final two steps in the sequential analysis. ALJ Langan noted that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." Tr. 29. Instead, based on the medical evidence of record, the ALJ concluded that:

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant: should avoid exposure to unprotected heights. She could occasionally climb ramps and stairs, but never climb ladders and scaffolds. She could tolerate occasional exposure to extreme cold temperatures, wetness, and vibrations. She should avoid interaction with the public, except for incidental contact. She could engage in occasional interaction with co-workers and supervisors. She should avoid fast production/pace rate work. She should be afforded the ability to alternate between sitting/standing every 30 minutes. She should avoid use of her right upper extremity for overhead activity. She could occasionally use her left upper extremity

for overhead activity.  She should avoid occupations that
would expose her to noise above level 3 noise intensity level.

*Id.* at 27.

In reaching that residual functional capacity determination, ALJ
Langan considered Borys's own testimony and other medical evidence
on her physical impairments.  During the hearing, Borys complained
that not only did she lose mobility in her neck after a surgery performed
by Dr. Alan Gillick, but she also gets headaches that "goes down into
[her] back." *Id.* at 57.  She also mentioned that her "hands and . . . feet
swell." *Id.*  Borys testified that she drives locally, "maybe once or twice
every two weeks . . . to the pharmacy or post office." *Id.*  Also, the
claimant mentioned that cannot use a vacuum cleaner, *id.* at 60, and
that she could do some light chores (such as folding laundry, buying
grocery, and light cooking), albeit with assistance from other family
members. *Id.* at 60, 246–47.  Further, Borys once reportedly climbed a
tree while camping with her husband. *Id.* at 857.

An opinion by Dr. Gillick, who performed a cervical fusion on
Borys on July 25, 2019, *id.* at 423, reported that Borys had "some
discomfort but her pain [wa]s much improved form preoperatively." *Id.*
at 426.  On October 14, 2019, the claimant was "struggling with some

neck discomfort" and "a lot of pain in the right shoulder area." *Id.* at 427. The physician also observed that Borys felt "pain with attempted overhead range of motion, either in flexion or abduction. [He] could not reproduce pain with internal or external rotation." *Id.* Then, on November 20, 2019, Dr. Gillick noted that Borys reported "pain with gentle flexion and extension and right and left rotational movements. [Borys's] upper extremity motor, sensation and reflexes are normal. Good circulation." *Id.* at 429.

About three months later, on February 29, 2020, Dr. Gillick observed that Borys continued to "struggle[] with overhead range of motion of the right shoulder but really had minimal relief with an injection." *Id.* at 431. By September 28, 2020, the claimant's "upper extremity motor and sensation and reflexes were normal[,]" but she continued to suffer "pain with any attempted overhead range of motion[.]" *Id.* at 1276. Similarly, on December 28, 2020, Borys complained of "pain with attempted overhead range of motion[,] both in flexion and abduction[,]" *id.* at 1298, and received significant relief from an injection. *Id.* at 1297. On April 19, 2021, the same physician noted that Borys's "right shoulder . . . show[ed] minimal tenderness but

significant restriction in range of motion[,] particularly abduction and flexion secondary to pain[.]" *Id.* at 1281.  Dr. Gillick also noted that an injunction offered relief for several weeks.  *Id.*

Such examinations enabled Dr. Gillick to provide his opinion on Borys's residual function capacity on May 13, 2020.  *Id.* at 1312–21. Relevantly, the doctor stated that Borys: (1) could occasionally lift and carry up to 10 pounds; (2) could never reach or handle; (3) could sit for six hours, and stand or walk for about four hours in an eight-hour workday; (4) must change her position every 30 minutes; (5) must be "off-task" for about 20% of an eight-hour working day; (6) must take an unscheduled break every two hours; and (7) must take about four to five absences each month.  *Id.* at 1314–16.

Similarly, Dr. Sean McCall noted on October 3, 2019, that Borys was "[p]rogressing well[]" after her cervical fusion.  *Id.* at 458–59.  On October 12, 2020, Borys reported to the same doctor that she experienced "tremendous difficulty postoperatively from her neck surgery with arm weakness and pain." *Id.* at 952–53.  Based on such observations, Dr. McCall opined that Borys: (1) could occasionally lift and carry up to 10 pounds; (2) could never reach, handle, or finger

frequently; (3) could sit for two hours, and stand or walk for about two hours in an eight-hour workday; (4) must change her position every 15 to 30 minutes; (5) must be "off-task" for more than 20% of an eight-hour working day; (6) must take an unscheduled break every 15 to 30 minutes; and (7) must take an indefinite number of absences each month. *Id.* at 1310–11. Then, on March 29, 2021, *id.* at 1413, after examining Borys, Dr. McCall recorded that Borys's neck was "supple" but "non-tender," and showed "no adenopathy, . . . bruits, . . . [jugular vein distention], . . . nodularity, [or] stridor." *Id.* at 1417.

Dr. Samuel Grodofsky, who examined Borys for her neck pain on at least six occasions, continuously noted Borys's complaint of neck pain. *Id.* at 406 (April 21, 2020), 408 (April 28, 2020), 413 (May 21, 2020), 416 (June 1, 2020), 1044 (July 6, 2020), 1048 (October 20, 2020). At the same time, in each of those visits, Borys demonstrated a "5/5 power in all upper extremity muscle groups[,]" as well as stable pain. *Id.* at 408, 411, 414, 417, 1045, 1049. Based on such observations, on May 18, 2020, Dr. Grodofsky opined that Borys could: (1) could occasionally lift and carry up to 10 pounds; (2) could never reach, handle, or finger; (3) could sit for two hours, and stand or walk for about

two hours in an eight-hour workday; (4) must change her position every 15 minutes; (5) must be "off-task" for more than 20% of an eight-hour working day; (6) must take an unscheduled break every 15 to 30 minutes of working; and (7) must take an indefinite number of absences each months. *Id.* at 1304–07.

Also relevant to ALJ Langan's assessment of Borys's residual functional capacity were the materials provided by Dr. Gaye Gustitus, a state agency consultant who examined Borys on July 20, 2020. *Id.* at 83–98. Dr. Gustitus determined that Borys could: (1) occasionally lift and carry up to 20 pounds, and frequently lift and carry up to ten pounds; (2) sit for up to six hours, and stand or walk for up to six hours in an eight-hour workday; (3) occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; (4) occasionally perform some posturing activities, such as stooping or crouching; (5) occasionally reach overhead; and (6) avoid exposure to wetness, extreme cold, vibrations, and industrial hazards (including machinery and heights). *Id.* at 92–93. Dr. Robert Czwalina, another state agency consultant who examined Borys on December 21, 2020, reached the same conclusions. *Id.* at 111–15, 121.

14

The cumulative evidence on Borys's residual functional capacity led ALJ Langan to disagree with her pertinent testimony. *Id.* at 29. More specifically, the ALJ determined that:

> [a]fter reviewing all of the evidence, the undersigned concludes that the claimant has the residual functional capacity to perform work activity at a range of a light exertional level with limitations resulting from her impairments. The above residual functional capacity assessment is supported by and consistent with the objective medical evidence, including the measurable findings upon clinical examination. The claimant reported complaints of multiple physical and mental health problems. The existence of her problems and resultant symptomatology are supported somewhat by the objective evidence of record, but not to the extent as alleged by the claimant. Limitations to exertional, postural, mental, and environmental factors have been included to address the claimant's well-supported objective deficits of record. The residual functional capacity is consistent with the claimant's activity level as indicated. The objective evidence does not support a finding that the claimant is more severely limited than stated above. In light of the evidence of record, the above residual functional capacity gives the claimant the benefit of the doubt but still does not preclude her from performing work activity.

*Id.* at 29, 33.

In sum, based on the evidence on Borys's physical impairments, the ALJ concluded that her "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record[.]" *Id.* at 29.

Having determined Borys's residual functional capacity and rejected several grounds for further limitation, ALJ Langan proceeded to the fourth step of the analysis to determine whether she was disabled within the meaning of the Social Security Act. *Id.* at 33. Here, the ALJ compared Borys's past relevant work and residual functional capacity, finding that she was unable to perform her prior employment as a warehouse worker. *Id.* at 33–34.

Finally, in the fifth step of the sequential analysis process, ALJ Langan considered Borys's age, education, work experience, and residual functional capacity to perform light work, concluding that Borys was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.* at 35. Here, the ALJ leveraged testimony provided by Abraham that a person fitting Borys's parameters could meet the requirements of "representative occupations" such as a folder, a marker, or a routing clerk. *Id.* at 34–35. ALJ Langan further noted that:

> Pursuant to SSR 00-4p, . . . the vocational expert's testimony
> was generally consistent with the Dictionary of Occupational

> Titles. However, in terms of the way the jobs identified by the vocational expert, regarding both the physical and cognitive aspects of these jobs (including the reduction in job quantities available), any divergence from the Dictionary of Occupational Titles was formulated based upon the vocational expert's knowledge and experience in this field (including observations and literature reviews) . . . .

*Id.* at 35. As a result of this analysis, ALJ Langan determined that Borys was not disabled and denied her application for disability benefits on November 30, 2021. *Id.* at 17–19. Borys unsuccessfully appealed the denial to the SSA's Appeals Council. *Id.* at 1–3. The instant appeal to the Court followed.

Borys initiated this action with the Court on June 23, 2023. Doc. 1. The Commissioner provided the requisite transcripts from the disability proceedings on August 21, 2023. Docs. 7–8. The parties then filed their respective briefs. Docs. 8, 17–18. The parties also consented to magistrate judge jurisdiction on June 30, 2023. Docs. 5, 19.

Borys alleges three errors warranting reversal or remand. Doc. 8 at 8. Specifically, Borys alleges that the ALJ: (1) performed an inadequate function-by-function assessment; (2) "failed to provide any reason for rejecting" limitations proposed by "three separate treating

physician[s]"; and (3) erred in his analysis of the fifth step under the sequential analysis as to her overhead reaching limitations. *Id.*

## III.  Discussion

### A.    Standard of Review

Review of the Commissioner's decision denying a claimant's application for social security disability benefits is limited to determining whether the factual findings of the final decisionmaker are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial in this context is "more than a mere scintilla of evidence but may be less than a preponderance." *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988) (citation omitted). Put more pointedly, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In an adequately developed record, this can mean "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [ALJ Langan's decision]

from being supported by substantial evidence." *Consolo v. Fed. Mar.*
*Comm'n.*, 383 U.S. 607, 620 (1966) (citations omitted).

Under this deferential standard, "[f]actual findings which are
supported by substantial evidence must be upheld." *Ficca v. Astrue*,
901 F. Supp. 2d 533, 536 (M.D. Pa. 2012) (citations omitted); 42 U.S.C.
§ 405(g). This court's role is not to reweigh the evidence and make
factual determinations, but to simply review the record and ensure that
the ALJ provided "a discussion of the evidence and an explanation of
reasoning for his conclusion sufficient to enable meaningful judicial
review." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009)
(citations and quotations omitted). An ALJ meets that standard by
stating "in his decision which evidence he has rejected and which he is
relying on as the basis for his finding." *Schaudeck v. Comm'r of SSA*,
181 F.3d 429, 433 (3d Cir. 1999) (citations omitted). Moreover, when
there is countervailing evidence, an ALJ must "give some reason for
discounting the evidence she rejects." *Plummer v. Apfel*, 186 F.3d 422,
429 (3d Cir. 1999) (citation omitted); *Mason v. Shalala*, 994 F.2d 1058,
1064 (3d Cir. 1993) (holding that substantial evidence standard is

unmet when ALJ fails to resolve conflicts created by countervailing evidence).

Here, ALJ Langan's factual findings were supported by substantial evidence in the record, and the reasoning underlying those conclusions was sufficiently articulated to permit judicial review.

## B.    Function-by-Function Assessment in Formulation of the Residual Functional Capacity

Borys first contends that ALJ Langan did not provide an explanation for his alleged decision to exclude sitting, standing, and walking limitations from her residual functional capacity, and that the failure violated his duty to conduct an adequate function-by-function assessment.  Doc. 8 at 14–18.  According to Borys, not only does this error frustrate meaningful judicial review, but, because the inclusion of such functional limitations may have impacted the vocational expert's testimony on her employment prospects, it was not harmless.  *Id.*  A review of the record, however, finds that ALJ Langan included sitting, standing, and walking limitations in Borys's residual functional capacity, and conducted an adequate function-by-function assessment in compliance with the applicable regulations.

When crafting a claimant's residual functional capacity and assessing whether a claimant can perform their past work at step four of the sequential evaluation process, an ALJ must explain which level of work the claimant is currently capable of performing. 20 C.F.R. §§ 404.1520(a)(4)(i)–(iv), 404.1545(a)(5)(i)–(ii); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The Social Security regulations include a tiered series of work capacities, ranging from "sedentary work" to "very heavy work." 20 C.F.R. § 404.1567(a)–(e). Relevant here are the regulations that define "light work," which expressly address sitting, standing, and walking:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

*Id.* § 404.1567(b).

In determining Borys's residual functional capacity, ALJ Langan concluded that she was limited to performing "light work as defined in

20 CFR 404.1567(b)," a category that by definition limits her to no more than "frequent lifting or carrying of objects weighing up to 10 pounds[,]" and a "good deal of walking or standing" during the workday.  20 C.F.R. § 404.1567(b).  The regulations further instruct that "'[f]requent' means occurring from one-third to two-thirds of the time.  Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251, at *6 (1983).  Thus, by limiting Borys to light work, ALJ Langan found that Borys was, at a minimum, limited to walking off and on for approximately 6 hours of the workday.  *See id.*; 20 C.F.R. § 404.1567(b).

The ALJ then proceeded to list further limitations on Borys's ability to perform certain activities, including her ability to sit and stand.  *See* 20 C.F.R. § 404.1567(b).  As highlighted by the Commissioner, Doc. 17 at 28, the ALJ explicitly provided that Borys "should be afforded the ability to alternate between sitting/standing every 30 minutes."  Tr. 27.  The Social Security regulations expressly provide for the incorporation of this type of limitation where "the

22

medical facts lead to an assessment of RFC which [is] compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing.  The individual may be able to sit for [some] time, but must then get up and stand or walk for awhile before returning to sitting." SSR 83-12, 1983 WL 31253, at *4 (1983).  The ALJ accordingly provided special limitations to accommodate Borys's more limited ability to sit and stand, which were more restrictive than the definition of "light work."  *See id.*

Borys relies on SSR 96-8p to assert that ALJ Langan's findings were in error.  Doc. 8 at 15–18.  Specifically, Borys leverages the "Exertion Capacity" section of the ruling, which provides, in pertinent part, that:

> Each function must be considered separately (e.g., "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment will combine activities (e.g., "walk/stand, lift/carry, push/pull").  Although the regulations describing the exertional levels of work and the Dictionary of Occupational Titles and its related volumes pair some functions, it is not invariably the case that treating the activities together will result in the same decisional outcome as treating them separately.

Social Security Ruling (SSR) 96–8p, 61 Fed. Reg. 34474, 34477 (July 2, 1996).

Conducting a "function-by-function assessment" requires that an ALJ "articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Brooks v. Saul*, 2019 WL 7048794, *7 (E.D. Pa. 2019) (quoting *Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (3d Cir. 2000)). This does not mean, as Borys seems to urge, that the ALJ must "make specific, written findings on dozens of individual work function categories." *Id.* Rather, it simply means the ALJ's "RFC determination must include an explanation of the substantial evidence upon which it relies." *Id.*

The limitation findings an ALJ makes during a residual functional capacity assessment are subject to the general duty of articulation standard set forth above. *See Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001) ("[T]he ALJ's finding of residual functional capacity must 'be accompanied by a clear and satisfactory explication of the basis on which it rests.'" (quoting *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981))). This means that well-articulated residual functional capacity assessments supported by substantial evidence are permitted to

24

include, in the absence of or in addition to their individually tailored limitation findings, ones pulled from the regulation's tiered series of work capacities. *See Chiaradio v. Comm'r of Soc. Sec.*, 425 F. App'x 158, 161 (3d Cir. 2011) (affirming residual functional capacity assessment with "light work" functional limitation that did not engage in "task by task analysis," but was well-articulated and supported "by substantial evidence on the record.").

That is precisely what ALJ Langan did here, enumerating a comprehensive discussion of the substantial evidence upon which his residual functional capacity determination relied.  The ALJ's discussion included consideration of symptom allegations, clinical records, examination evaluations, treatment records, and opinion evidence; in other words, it addressed all the pertinent evidence of record.  Tr. 27– 33.  ALJ Langan explained that, based on certain evidence— specifically, treatment notes; history of treatment and pain; and some limitations in performing daily activities—Borys, in addition to standard light work limitations, required individualized exertional, postural, mental, and environmental limitations.  *Id.* at 27.  Those additional restrictions, coupled with the inherent limitations of the

"light work" definition, were consistent with the evidence and physicians' opinions in the record that the ALJ deemed persuasive. *Id.* at 27–33. The Court refrains from reweighing those factual determinations. *See Diaz*, 577 F.3d at 504.

ALJ Langan also found that, because the record lacked sufficient evidence supporting Borys's allegations of pain after surgery and of an impaired ability to perform daily functions, no additional limitations beyond those already outlined were necessary. Tr. 27–30. That well-articulated "explication of the basis on which" ALJ Langan's function-by-function assessment relied was substantially supported by the evidence of record, *id.* at 83–98, 100–21, 406–18, 426–31, 458–63, 952–58, 1044–50, 1276–81, 1297–98, 1302–07, 1309–11, 1312–21, 1413–21, comports with the mandates of SSR 96-8p, and does not give rise to any analytical error. *See Fargnoli*, 247 F.3d at 41.

Borys further argues that the supposedly factually analogous matters of *Barbour v. Kijakazi*, 2021 WL 4478332 (M.D. Pa. 2021), and *Mattox v. Kijakazi*, 2023 WL 5943135 (M.D. Pa. 2023), militate in favor of remand here. Docs. 13 at 16–18; 18 at 7–8. A review of *Barbour* and

*Mattox* finds that those nonbinding cases are inapposite to the facts now before the Court.

In *Barbour*, the Court rejected an ALJ's residual functional capacity determination because "the inadequacies in the ALJ's function-by-function assessment, and evaluation of the medical opinion evidence" frustrated meaningful judicial review.  2021 WL 4478332, at *5. Specifically, the ALJ made no specific findings regarding the claimant's ability to stand and walk, despite lingering record inconsistencies concerning those functional capacities.  *Id.*  This, the Court found, was significant because it may have impacted the testimony elicited from the vocational expert.  *Id.* at *6.

Likewise, in *Mattox*, the Court remanded a disability benefits denial because the administrative decision had inadvertently and materially mischaracterized a medical opinion on which it relied when fashioning the claimant's residual functional capacity limitations. 2023 WL 5943135, at *7.  The Court found that not only did this error frustrate judicial review, but it was harmful because, similar to the facts in *Barbour*, it had a potential impact on the testimony delivered by the vocational expert.  *Id.* at *8.

Here, unlike the circumstances in *Barbour* and *Mattox*, ALJ Langan accurately summarized the medical opinions he considered when fashioning the claimant's residual functional capacity limitations in the areas of walking, standing, and sitting, Tr. 30–33, and made specific findings regarding the claimant's ability in those areas, both through a residual functional capacity assessment of light work, and additional specific limitations. *Id.* at 27. Accordingly, since ALJ Langan's function-by-function assessment in his residual functional capacity determination was premised on substantial evidence and was sufficiently articulated to permit judicial review, it will be left undisturbed.

### C.    Evaluation of Medical Opinions provided by Drs. Gillick, McCall, and Grodofsky

Borys further contends that ALJ Langan erred in rejecting the medical opinions of treating physicians Drs. Gillick, McCall, and Grodofsky. Doc. 8 at 18–24. But Borys's disagreement with the ALJ's assessment of those opinions does not warrant remand where, as here, that evaluation comported with all applicable regulatory requirements.

The three doctors all opined that Borys needs some non-exertional limitations. Dr. Gillick opined that Borys: (1) must be "off-task" about

20% of an eight-hour working day; (2) must take an unscheduled break every two hours; and (3) must take about four to five absences each month. Tr. 1316. Likewise, both Drs. McCall and Grodofsky stated that Borys: (1) must be "off-task" for more than 20% of an eight-hour working day; (2) must take an unscheduled break every 15 to 30 minutes; and (3) must take an indefinite number of absences each month. *Id.* at 1306, 1311.

Borys takes umbrage with the ALJ's decision to credit the opinions of Drs. Gustitus and Czwalina, two state agency consultants, over those provided by the three treating physicians. Doc. 8 at 18–24. She correctly observes that Drs. Gustitus and Czwalina did not establish non-exertional limitations regarding off-task time, unscheduled breaks, and monthly absences. *Id.* at 19. Borys concludes that, as ALJ Langan found the state agency consultants' opinions are "largely persuasive," Tr. 33, but determined that the statements provided by the three treating physicians were "unpersuasive," *id.* at 32, without providing any explanation, the administrative decision warrants a remand. Doc. 8 at 18–24.

Under the current regulation, medical opinions are not entitled to any specific weighting, and are instead evaluated for persuasiveness. 20 C.F.R. § 404.1520c(a)–(b). An ALJ determines the persuasiveness of a prior medical finding or medical opinion by assessing five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. *Id.* § 404.1520c(a)–(c). The factors related to the substance of medical opinions—supportability and consistency—are the "most important factors." *Id.* § 404.1520c(b)(2). Examining supportability entails a review of the opinion's basis in relevant "objective medical evidence and supporting explanations presented by a medical source." *Id.* § 404.1520c(c)(1). Consistency is assessed based on how consistent a finding or opinion is "with the evidence from other medical sources and nonmedical sources in the claim[.]" *Id.* § 404.1520c(c)(2).

The Court of Appeals explained that, when weighing the record, an ALJ "cannot reject evidence for no reason or the wrong reason" and must explain "why probative evidence has been rejected . . . so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter v. Harris*, 642 F.2d 700, 706–07 (3d Cir. 1981). This

30

does not mean, however, that the ALJ must undertake an exhaustive discussion of all of the evidence. *See, e.g., Fargnoli*, 247 F.3d at 42; *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004) ("There is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record.").

Here, ALJ Langan found the treating physicians' opinions unpersuasive because they lacked significant support in and were inconsistent with the weight of the evidence. The ALJ explained that those statements "overestimate[d] the claimant's degree of limitation," and noted that Borys's "physical examination findings more consistently revealed more mild to moderate symptoms. . . . Because the claimant's signs, symptoms, and residual ability are more consistent with an individual who retains a light residual functional capacity, this opinion, an opinion that suggests complete disability, is found to be unpersuasive." Tr. 32.

Further, ALJ Langan explained his reasoning for finding the opinions provided by Drs. Czwalina and Gustitus more persuasive:

> the medical evidence of record, inclusive of the physical examination findings and the objective evidence, supports the limitation to light work suggested by Drs. Czwalina and Gustitus. Throughout the period of review, the claimant has

experienced sufficiently documented symptomatology that
has restricted the claimant's ability to work and to address
her daily household/personal tasks . . . .  Her care, save her
cervical spinal surgery, remains largely conservative with
medication management.  Accordingly, the undersigned finds
that these opinions are largely persuasive.

*Id.* at 33.

Those analyses readily meet ALJ Langan's regulatory duty to
consider the consistency and supportability of the two branches of
opinions, in arriving at the conclusion that the treating physicians'
statements were unpersuasive.  *See, e.g., Jones v. Sullivan*, 954 F.2d
125, 129 (3d Cir. 1991) (holding medical opinions that are inconsistent
with and unsupported by the medical evidence are not persuasive or
controlling); *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990) (same).
Furthermore, this Court's role is not to reweigh the evidence to make its
own factual determinations.  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d
356, 359 (3d Cir. 2011).

Borys raises seven additional arguments in contending that the
ALJ made a reversible error, Doc. 8 at 19–24, but none prevail.  They
are:

1.    ALJ Langan "only discussed the . . . opinions as it pertains to
      the ability to perform 'light work,'" which "has nothing to do

with the need for time off task, absences from work, or
unscheduled breaks[]";

2.    The ALJ failed to cite evidence that is inconsistent with the
opinions provided by Drs. Gillick, McCall, and Grodofsky;

3.    ALJ Langan failed to explain how Borys's daily activities are
inconsistent with the treating physicians' opinions;

4.    The ALJ incorrectly stated that the treating physicians'
opinions provide for complete disability;

5.    ALJ Langan's analysis is backward, as he "pre-determined
[Borys's] activities to be consistent with light work and then
compared to the opinions to this pre-determination[]";

6.    The ALJ "necessarily relied upon his own lay
reinterpretation of the evidence to reject the treating source
opinions," as the state agency consultants did not opine on
Borys's "limitations in time off task, absences from work,
and unscheduled breaks[]"; and

7.    ALJ Langan "gave no reason for rejecting the opinions
regarding the limitations in time off task, absences from
work, and unscheduled breaks," which were provided by the
three treating physicians.

*Id.*

Two of the seven averments, the first and sixth, rest on the

additional limitations as to time-off tasks, absences from work, and

unscheduled breaks. *Id.* at 20–21. Those accommodations, as discussed

above, fail to provide grounds for remand.

Three of the other five considerations stretch the record. For

example, Borys's second and third arguments claim that ALJ Langan

found some of the medical opinions inconsistent, Doc. 8 at 20–21,

though the ALJ merely said that he found that evidence "unpersuasive."

Tr. 32.  In any event, the ALJ detailed his reasoning for finding those

opinions unpersuasive, when compared to the objective evidence of

record.  *Id.*  Her fourth contention is that the ALJ stated incorrectly

that the medical materials provided by Drs. Gillick, McCall, and

Grodofsky "provide for 'complete disability,'" Doc. 8 at 21, when they

merely outline "specific functional limitations."  *Id.*  But, as the

Commissioner correctly notes, Doc. 17 at 15 n.4, this statement was

based on the comments that Borys remains "incapable of sedentary

work."  Tr. 1302, 1312.  As sedentary work is the lowest of the tiered

series of work capacities set forth in 20 C.F.R. § 404.1567(a)–(e), any

opinion that a claimant is unable to perform such work logically leads to

an interpretation of complete disability.

Borys's remaining two arguments also fail to establish that

remand is warranted.  Specifically, Borys's fifth contention is that the

ALJ's "analysis is backwards," as he allegedly "pre-determined [her]

activities to be consistent with light work and then compared to the

opinions to this pre-determination."  Doc. 8 at 21.  Her seventh

argument is that "the reports of non-examining sources are generally given less weight than those of examining and treating sources." *Id.* at 22 (citations omitted). Both arguments fail to undermine the substantial evidence on which ALJ Langan issued his decision, and this Court's ability to conduct meaningful judicial review. *See Sponheimer v. Comm'r of Soc. Sec.*, 734 F. App'x 805, 808–09 (3d Cir. 2018) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)) (holding that judicial courts "defer to [ALJ's] credibility determination" when substantial evidence outweighs complaints "not otherwise supported by the record."); *see also* 20 C.F.R. §§ 404.1520c(a) (declaring that ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from . . . medical sources.").

Therefore, because ALJ Langan evaluated the medical opinions pursuant to his regulatory duty to gauge persuasiveness, his findings will not be disturbed.

### D.    Conflict between Vocational Expert Testimony and *DOT*

In her third and final challenge, Borys attacks ALJ Langan's alleged failure to consider that Borys "can never use her right . . . arm

for overhead activity and can only occasionally use her left arm for overhead activity." Doc. 8 at 9–14 (citation omitted). According to Borys, each of the jobs identified by the vocational expert—a folder, a marker, and a routing clerk position—"requires frequent or constant reaching" under *DOT*, and neither *DOT* nor the Selected Characteristics of Occupations, a complementary text to *DOT*, distinguishes "between overhead reaching and reaching in other directions." *Id.* at 10. Therefore, Borys surmises, the ALJ failed to resolve the apparent conflict between the vocational expert's testimony and *DOT*, warranting a remand. *Id.* at 11, 14. This position, however, does not yield any relief.

Under the current regulatory framework governing the fifth step of the sequential analysis, when an ALJ "determine[s] that unskilled, sedentary, light, and medium jobs exist in the national economy . . . , [he or she] will take administrative notice of reliable job information available from various governmental and other publications," including *DOT*. 20 C.F.R. § 404.1566(d)(1).

Regarding vocational expert testimony and potential conflicts, the regulatory framework provides that:

> Occupational evidence provided by a [vocational expert] . . . generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between [vocational expert] . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert] . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Social Security Ruling, SSR 00–4p, 65 Fed. Reg. 75759, 75760 (Dec. 4, 2000).

Notably, "[n]either the DOT nor the [vocational expert] . . . evidence automatically "trumps" when there is a conflict." *Id.* Instead, the ALJ "must resolve the conflict by determining if the explanation given by the [vocational expert] . . . is reasonable and provides a basis for relying on the [expert's] . . . testimony rather than on the DOT information." *Id.* This means that the ALJ must: "(1) ask, on the record, whether the [vocational expert's] testimony is consistent with the DOT[;] (2) 'elicit a reasonable explanation' where an inconsistency does appear[;] and (3) explain in its decision 'how the conflict was resolved.'" *Zirnsak v. Colvin*, 777 F.3d 607, 617 (3d Cir. 2014) (quoting *Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002)).

Here, the Court is unconvinced that this case should be remanded for two reasons. First, the ALJ need not "inquire into conflicts" if "the DOT and testimony of the vocational expert w[ere] not necessarily inconsistent . . . ." *Burns*, 312 F.3d at 128 (footnote omitted). A corollary is that no reversible error exists if *DOT* lacks discussions of a certain limitation in its job descriptions, and thus does not contradict an expert's testimony. *See Sanborn v. Comm'r of Soc. Sec.*, 613 F. App'x 171, 177 (3d Cir. 2015). As Borys herself acknowledges, neither *DOT* nor its companion text distinguish between types of reaching or "address overhead reaching specifically." Doc. 8 at 10. Thus, any limitations that she has on overhead reaching does not necessarily contradict the generalized reaching requirements of a folder, marker, or routing clerk under the *DOT*. *See Sanborn*, 613 F. App'x at 177.

Borys argues that the analogous case of *Fariss v. Berryhill*, No. 17-CV-1741 (M.D. Pa. 2017), favor remand here. Docs. 8 at 9–13. In *Fariss*, the issue was the evident discrepancy between the *frequencies* of reaching that were established by *DOT* and the ALJ. *Fariss v. Berryhill*, No. 17-CV-1741, report & recommendation at 14–15 (M.D. Pa. Apr. 17, 2017) ("each position cited by VE . . . requires more than

'occasional' reaching, while the ALJ limited Plaintiff to occasional overhead reaching." (citing *Pearson v. Colvin*, 810 F.3d 204 (4th Cir. 2015))), *report and recommendation adopted*, order (M.D. Pa. May 7, 2019). In the instant case, the alleged conflict involves the *types* of reaching defined by *DOT* and ALJ Langan. Doc. 8 at 10. As explained above, the two sources do not create a clear contradiction. The ALJ thus was not required to reconcile his findings with *DOT*. *See Burns*, 312 F.3d at 128; *Sanborn*, 613 F. App'x 177.

Second, to the extent any conflict does exist, ALJ Langan met his duties during and after the hearing. The ALJ asked on record whether Abraham's opinions have "been consistent with the *Dictionary of Occupational Titles* and its related publications." Tr. 76. Abrahams stated that her opinions conflicted "in regard to alternating of positions, the reduction of the numbers, as well as overhead activities," as those requirements "were . . . based upon evaluating representative examples such as the ones [she] provided [that day] within the economy." *Id.* at 76–77. The ALJ accordingly reasoned that the expert testimony "was generally consistent with the Dictionary of Occupational Titles," and that "any divergence from the Dictionary of Occupational Titles was

formulated based upon the vocational expert's knowledge and experience in this field (including observations and literature reviews) . . . ." *Id.* at 35. Thus, the ALJ fulfilled his duties of inquiring about any potential conflicts, eliciting a reasonable explanation on the record, and explaining the basis of his resolution in the decision. *See Burns*, 312 F.3d at 127–28.

Therefore, since ALJ Langan's determination at the fifth step of the sequential analysis was founded on substantial evidence, the Court will not disturb the Commissioner's decision on this ground.

## IV.    Conclusion

Accordingly, the Court affirms the Commissioner's decision. A separate order shall be issued.


Date:  September 30, 2025          ___*s/ Phillip J. Caraballo*___
                                   Phillip J. Caraballo
                                   United States Magistrate Judge